# United States District Court, Northern District of Illinois

JS6

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 9232 | **DATE** | 4/26/2004 |
| **CASE TITLE** | Sir Ezell Wilkins vs. Riveredge Hospital | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due _____. Reply to answer brief due _____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. There is no genuine issue of material fact, so that Riveredge's Rule 56 motion is granted and this action is dismissed. (35-1)

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | APR 27 2004 | 45 |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | JXM | |
| | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 4/26/2004 | |
| SN | courtroom deputy's initials | | date mailed notice SN | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SIR EZELL WILKINS, )
)
Plaintiff, )
)
v. ) No. 02 C 9232
)
RIVEREDGE HOSPITAL, )
)
Defendant. )

DOCKETED
APR 2 7 2004

## MEMORANDUM OPINION AND ORDER

Sir Ezell Wilkins ("Wilkins") has sued his former employer Riveredge Hospital ("Riveredge") under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e) for assertedly discriminating against him on account of sex when it terminated his employment and then refused to rehire him after an internal appeal. Riveredge has moved for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56, and both parties have complied for the most part with this District Court's LR 56.1.[1] Because Wilkins has not created a reasonable factual inference that either or both of Riveredge's decisions (1) to terminate him and then (2) not to rehire him were because of his sex, Riveredge's motion for summary judgment is granted and this action is

---

[1] LR 56.1 requires parties to submit evidentiary statements and responses to such statements to highlight which facts are disputed and which facts are agreed upon. This opinion cites to Riveredge's LR 56.1 statement as "R. St. ¶--," to Wilkins' LR 56.1 statement as "W. St. ¶--" and to the parties' respective responses as "R. Resp. ¶--" and "W. Resp. ¶--." Where either party's original statement is undisputed by the opponent, this opinion includes only a citation to that original statement.

dismissed.

## Rule 56 Standards

Every Rule 56 movant must establish the absence of a genuine issue of material fact (Celotex Corp. v. Catrett, (477 U.S. 317, 322-23 (1986)). For that purpose this Court considers the evidentiary record in the light most favorable to the nonmovant and draws all reasonable inferences in his favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows is a summary of the facts viewed in the light most favorable to nonmovant Wilkins--but within the limitations created by the extent of his compliance (or noncompliance) with the strictures of LR 56.1.

## Facts

Riveredge is a mental health facility specializing in psychiatric care for adolescents (W. St. ¶1; R. St. ¶5). Between October 2000 and November 2001 Wilkins worked as a night shift mental health counselor, serving predominantly in one of

2

Riveredge's female adolescent units (W. St. ¶1; R. St. ¶8; W. Resp. ¶9). His immediate supervisor was Nurse Manager Elaine Shemroske ("Shemroske") (W. St. ¶5). One of Wilkins' regular duties was to conduct patient rounds every fifteen minutes by physically "eyeballing" each patient and making a notation of the patient's location on Psychiatric Nurse Flow Sheets ("Rounds Sheets") (W. St. ¶¶10, 19; R. St. ¶¶20, 28, 30, 35; W. Resp. ¶22).

On November 7, 2001 a patient named "Dominique" was discharged from Riveredge at 6 p.m. (W. St. ¶13). Wilkins was the Riveredge employee who escorted her to the lobby and then (as required) separated her Rounds Sheet from the rest of the pile of such sheets and left it on the nurse's desk (W. St. ¶¶15-16, R. St. ¶47). But Wilkins did not put Dominique's Rounds Sheet in the "closed file box"--also as required and as he had done when he assisted with discharging previous patients (R. St. ¶¶45, 48). At about the same time another employee in the unit lost her keys, so that all patients were sent to their rooms until the missing keys could be located (W. St. ¶¶5, 9).

When Wilkins returned from discharging Dominique, he picked up the stack of Rounds Sheets and began to conduct rounds (W. St. ¶17) Although Wilkins says he was unaware of it, Dominique's

3

Rounds Sheet was somehow in the pile of Rounds Sheets,[2] and throughout the course of the evening Wilkins made several notations on Dominique's Rounds Sheet that she was either "in room," "in group" or "sleeping" (W. St. ¶¶18, 22; R. St. ¶¶53, 55). Two notations on Dominique's Rounds Sheet were also made by Riveredge employee Sherrie Dean ("Dean") after Dominique's discharge (W. St. ¶56; R. St. ¶99).

Because Dominique had in fact been discharged several hours earlier, of course Wilkins did not really see her when he made the several notations of having done so on her Rounds Sheet (R. Resp. ¶20). Wilkins says he veered from his normal practice of eyeballing each patient that night because (due to the lost keys incident) all of the patients were in their rooms and not at different locations throughout the unit as usual. So rather than locating each individual patient visually and then making a notation on her Rounds Sheet, Wilkins simply verified that all patients were in their rooms and then marked the Rounds Sheets accordingly, but without checking the individual names (W. St. ¶¶19-21; R. St. ¶50; R. Resp. ¶¶19-20). But at the end of his shift Wilkins reviewed the Rounds Sheets and realized that Dominique's had been inadvertently filled in throughout the

---

[2] What has just been said in the text is in obvious tension with Wilkins' statement that he had earlier left Dominique's Rounds Sheet on the nurse's desk. But because Rule 56 does not allow for credibility determinations, all aspects of nonmovant Wilkins' version are being credited here.

course of the night--long after she had left the hospital (W. St. ¶24).³

After noticing the problem with Dominique's Rounds Sheet in the morning, Shemroske brought the sheet to her immediate supervisor Pat Thomas ("Thomas," also a female)(W. St. ¶¶26, 30; R. St. ¶¶6, 57). Shemroske showed Thomas the entries that Wilkins had made on Dominique's Rounds Sheet and recommended that Wilkins be terminated for falsification of patient records (W. St. ¶¶31-33, R. St. ¶58).

When Wilkins arrived for work on November 8, 2001 he was immediately called into a meeting with Shemroske, Thomas and HR representative Karen Lindsay ("Lindsay") (W. St. ¶40). Thomas showed Wilkins Dominique's Rounds Sheet and asked him if he had made the entries. He freely admitted that he had. Thomas

---

³ Wilkins also says that before he left Riveredge that night he left a note in Shemroske's mailbox, informing her about the problem with Dominique's Rounds Sheet and asking her how he should handle the situation (W. St. ¶24). Shemroske claims she never received that note (a fact that Wilkins does not contradict with any evidence, though it would seem highly problematic that he could be able to do so in such a "he said, she said" situation). But Wilkins does admit that he never mentioned the note to Shemroske the next morning, nor more importantly did he do so to any other Riveredge employee who evaluated his claim throughout his appeals process (R. St. ¶¶72-74, 81). LR 56.1 responses that mistakenly echo Rule 8(b), which applies only to responsive pleadings, by stating that a party does not have sufficient information to admit or deny a fact, or any responses that fail to cite to any record evidence to support a dispute, are ineffective in the summary judgment context. As a result any facts that Wilkins improperly purports to controvert are admitted (McGuire v. United Parcel Serv., 152 F.3d 673, 675 (7th Cir. 1998)).

5

informed him that his conduct was grounds for termination, and Wilkins was promptly terminated for falsification of patient records (W. St. ¶41; R. St. ¶68).

As permitted by Riveredge's grievance policy, Wilkins appealed his termination (W. St. ¶46). In his appeal letter Wilkins explained the unusual circumstances surrounding his conduct (the lost keys issue plus his assertion that he was unaware that Dominique's Rounds Sheet was in the pile of Rounds Sheets he was completing) and argued that he was terminated for a clerical error that he was never given the opportunity to correct (W. St. ¶¶47-48). Although Wilkins asked that his grievance hearing be held before CEO Mark Russell ("Russell"), the hearing was conducted by CFO Jack Barzilai ("Barzilai") and attended by Lindsay (W. St. ¶¶52-53; R. St. ¶¶82-83; W. Resp. ¶79).

After hearing Wilkins' explanation and arguments, Barzilai was not persuaded that Wilkins' discharge was unwarranted based on the circumstances, and he therefore denied the request for reinstatement (R. St. ¶¶86-87). Wilkins's current lawsuit stems from his belief that Riveredge's decisions to terminate and then not to rehire him were related to his sex (R. St. ¶3).

## Application of the Rule 56 Standards

Amidst this factual brouhaha, Wilkins discrimination claim is really entirely hinged on one idea: Both he and Dean made entries on Dominique's Rounds Sheet, but (1) initially Wilkins

6

was terminated and Dean was not and (2) ultimately, after Dean was then terminated, she was rehired and Wilkins was not.

Wilkins attempts to prove that claim for reverse sex discrimination[4] using both methods available to such a claimant (Mills v. Health Care Serv. Corp., 171 F.3d 450, 454 (7th Cir. 1999)). Under the direct method Wilkins must produce either direct or circumstantial evidence that would entitle a jury to conclude that Riveredge discriminated against him because of his sex (Rogers v. City of Chicago, 320 F.3d 748, 753-54 (7th Cir. 2003)). Alternatively Wilkins could rely on the indirect method first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Under that rubric Wilkins must first establish a prima facie case of sex discrimination by raising a genuine issue of material fact as to a set of factors particularized to his circumstances (Flores v. Preferred Technical Group, 182 F.3d 512, 515 (7th Cir. 1999)). If he meets that hurdle, the burden then shifts to Riveredge to offer a legitimate nondiscriminatory reason for its actions (Gordon v. United Airlines, Inc., 246 F.3d 878, 886 (7th Cir. 2001)). And if it does so, then the burden of production finally shifts back to Wilkins (who always has the

---

[4] That label is somewhat odd when applied to a situation of the type involved here, where the relevant universe is primarily female and Wilkins is thus a member of a minority in that matrix. But both because males have not historically been the victims of discrimination vis a vis females and because opinions such as that in Mills employ the "reverse discrimination" usage, this Court does so as well.

7

burden of persuasion) to show[5] that Riveredge discriminated against him based on his sex, most likely by showing that its asserted reason is so factually baseless, insufficiently explanatory or otherwise dubious that a jury could find it unworthy of credence and really a pretext for discrimination (id. at 888-89).

Wilkins' attempt to avoid summary judgment via the direct method fails quickly. There is no doubt that Shemroske made numerous comments that could indicate a bias against men. She frequently expressed concerns about the male/female ratio in the unit and about males working in a female adolescent unit generally. Those concerns were sought to be justified by her on several rationales, including the convincing view that there were certain tasks (like bathing supervision) that ought to be performed only by female staff members, as well as a generalization--perhaps more conclusionary--that only the most mature male staff could handle dealing with some of the emotional issues prevalent among the girls (W. St. ¶¶73, 81-82, 85-88; R.

---

[5] In the summary judgment context, of course, Wilkins' burden is only that of creating reasonable inferences, not one of proof as such (see Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1124 (7th Cir. 1994)). But any continued repetition of that burden involves an awkward locution, an awkwardness contributed to by the fact that so much of the caselaw speaks of what a party responding to a Rule 56 motion must "establish" or "prove" or "show." Whenever this opinion employs such terms, it should therefore be understood as denoting Wilkins' lesser burden of creating reasonable inferences, not the actual burden of persuasion.

8

St. ¶¶127-28; R. Resp. ¶¶73, 82).

But the problem with pointing to such comments by Shemroske is that they fail to equate to direct evidence of Riveredge's discriminatory motivation, because they are not comments by any of its decisionmakers. Nor is there any indication that they somehow poisoned the well from which the decisionmakers drew their decisions to terminate and not to rehire Wilkins (Miller v. Borden, Inc., 168 F.3d 308, 312 (7th Cir. 1999)).

As to the first of those considerations, Shemroske was not responsible for Riveredge's decision to terminate Wilkins, nor was she involved in the decision not to rehire him after his grievance hearing (W. St. ¶38; R. St. ¶90). Certainly she was the Riveredge employee who originally brought Wilkins' conduct to the attention of the chain of command, and clearly it was within her authority to recommend whether or not an employee should be terminated (W. St. ¶¶30-34; R. Resp. ¶¶29, 34). Nonetheless the ultimate decisions to terminate Wilkins, and later not to rehire him, had to be made by a member of Riveredge's executive staff (W. St. ¶38; R. St. ¶61; R. Resp. ¶¶29, 37).

Of course an upper manager reviewing decisions may sometimes function merely as a cat's-paw for determinations really made by a more direct supervisor such as Shemroske (Willis v. Marion County Auditor's Office, 118 F.3d 542, 547 (7th Cir. 1997)). And if this were a situation where the executive employees who made

9

the choices to terminate and then not to rehire Wilkins based their decisions only--or even materially--on information provided to them by Shemroske, what could fairly be viewed as her discriminatory perspective could raise a reasonable inference that Riveredge discriminated against Wilkins on account of his sex (<u>Mateu-Anderegg v. Sch. Dist. of Whitefish Bay</u>, 304 F.3d 618, 627 (7th Cir. 2002) (Ripple, J., concurring)).

But that it not the case here. Looking first to the decision to terminate Wilkins, it is clear that several different people (including Shemroske, Thomas and Lindsay) all provided information to the final executive decisionmaker (W. St. ¶¶33, 35, 37-38; R. Resp. ¶37). Wilkins has not presented any evidence that either Thomas or Lindsay was anything but impartial in her presentation of the situation. Indeed, Thomas' previous disagreement with Shemroske regarding her opinions about the impact of having men in her unit suggests that even if Shemroske's views influenced her own actions, Thomas' involvement sufficiently insulated the final decision to terminate Wilkins from any anti-male animus (W. St. ¶99; R. St. ¶¶128, 130).

It is also clear that Shemroske played no role at all in the later decision not to rehire Wilkins (R. St. ¶90). At that analytically distinct stage (<u>Sauzek v. Exxon Coal USA, Inc.</u>, 202 F.3d 913, 920 (7th Cir. 2000)), Barzilai alone considered the arguments that Wilkins presented in his appeals letter and gave

him ample opportunity to explain himself in person at his grievance hearing (W. St. ¶53; R. St. ¶86).

With there thus being no indication that either employment decision independently made by Riveredge's executive staff was tainted by Shemroske's comments, no causal link even arguably exists between those comments and the decisions. Shemroske's comments are not even enough to approach a "convincing mosaic" of circumstantial evidence that could create an inference of intentional discrimination, such as to allow Wilkins to survive summary judgment on a direct method theory (Cerutti v. BASF Corp., 349 F.3d 1055, 1061 (7th Cir. 2003); Schreiner v. Caterpiller, Inc., 250 F.3d 1096, 1099 (7th Cir. 2001)).

Wilkins must therefore seek to turn to the ready-made presumptions of the indirect method. In that respect his first hurdle is to meet his prima facie burden by creating at least reasonable inferences (1) that some background circumstances exist that indicate that Riveredge is one of those unique employers that discriminates against men (who have historically been a favored group), (2) that Wilkins suffered an adverse employment action and (3) that he was treated less favorably than other similarly situated employees (Mills, 171 F.3d at 454, 457).[6]

---

[6] Because Wilkins concedes that he made the incorrect notations on Dominique's Rounds Sheet, his claim is based on a disparate discipline theory, which takes out of play any need to

In terms of the first factor, several of Shemroske's comments (explored earlier in this opinion) reflect that she was acutely aware of the sex of the employees in her unit. Regardless of her nondecisionmaker status in this instance, Shemroske's comments might suffice to raise a genuine issue of material fact for purposes of the required flexible inquiry (id. at 457). Next, it is readily apparent that Wilkins suffered adverse employment actions when he was terminated and when his request for reinstatement was denied after a grievance hearing (R. St.¶87). But as to the final prong of the necessary prima facie sex discrimination case, Wilkins asserts that he was treated less favorably than Dean. And there he fails because he has not raised a genuine issue of material fact to imply that he and Dean were similarly situated, such that a comparison would contribute meaningfully to a discrimination evaluation.

Employees are "similarly situated" if they are directly comparable in all material respects (Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002)). In the disparate discipline context, that typically means a plaintiff and his assertedly comparable employee were subject to the same standards, had the same supervisor "and had engaged in similar conduct without such differentiating or mitigating circumstances

---

show that he was meeting Riveredge's legitimate employment expectations (W. St. ¶23; Flores, 182 F.3d at 515).

as would distinguish their conduct or the employer's treatment of them" (Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)).

At the threshold it must be held that the only proper comparison between Wilkins and Dean looks to Riveredge's divergent decisions to rehire Dean but not Wilkins after their respective grievance hearings. To be sure, Wilkins argues that the circumstances surrounding his original termination should also be considered because Dean also made false entries on Dominique's Rounds Sheets but was not terminated in November 2001 for her conduct (W. St. ¶¶ 56-57). But that is a red herring, for the record reveals that Dean was not terminated in November 2001 because Riveredge did not know of Dean's violations at that time (R. St. ¶¶71, 80, 88-89).[7] When Riveredge did find out about Dean's conduct several months later, it promptly terminated her (R. St. ¶¶94, 98).

Clearly the relevant Wilkins-Dean comparison at the rehiring

---

[7] Wilkins attempts to raise a factual issue on this point by offering the testimony of fellow Riveredge employee Dwayne Ross ("Ross") (1) that he spoke with Shemroske (who was not even potentially a decisionmaker) after Wilkins was terminated about Dean's involvement in the incident and (2) that there was a general "buzz" around the unit that Wilkins had been terminated for making the entries on Dominique's Rounds Sheet while Dean had not (W. St. ¶¶62-63). That attempt fails because Ross' statements are either unsupportive of the material facts Wilkins is trying to establish or are based on classic hearsay that would be inadmissible at trial and is correspondingly inadmissible for summary judgment purposes (R. St. ¶¶112, 117, 122; R. Resp. ¶¶62-63; Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995)).

stage is incongruous as to several factors. First, even though Shemroske supervised both Wilkins and Dean, they are still not appropriately comparable because different people were responsible for the decisions to rehire Dean and not to rehire Wilkins (Radue, 219 F.3d at 618). It was Barzilai who made the decision not to rehire Wilkins after his grievance hearing (R. St. ¶87). By contrast, Dean's grievance hearing was attended by Russell, HR representative Marc Pieart ("Pieart") and Thomas, with the decision to rehire Dean being made by Russell alone, despite recommendations from both Pieart and Thomas that Dean should not be rehired (W. St. ¶¶67, 70-72; R. St. ¶¶104, 110; W. Resp. ¶105). Wilkins has proffered nothing to cast any cloud on the evidence as to the executive personnel who were responsible for the decisions to rehire or not to rehire the two employees (R. St. ¶139; W. Resp. ¶¶87,104).[8]

Just as importantly and as an independent ground for rejecting Wilkins' contentions, he has not provided any arguable showing that, in light of all facts and circumstances involving the two employees, the conduct that he and Dean engaged in was

---

[8] Relatedly it is worth noting that Shemroske (the only Riveredge actor who Wilkins legitimately claims may have harbored a gender bias) played no role in the decision to terminate Dean or the later choice to rehire her (R. St. ¶¶98, 104, 111). And (as already discussed at some length) there is no indication that the grievance hearings held by Barzilai and Russell were just pro-forma levels of review rubber-stamping the decisions of a sex-discriminatory lower manager in an attempt to avoid liability (R. St. ¶135; Willis, 118 F.3d at 547).

14

sufficiently indistinguishable so that Riveredge could not legitimately rehire Dean while rejecting Wilkins (Radue, 219 F.3d at 618). In that regard there is no dispute that violations of Riveredge's policy as to falsification of patient records (or any other hospital policy violations) are reviewable matters, with the ultimate decision to terminate an employee being within the discretion of an executive member of Riveredge's administration given all the facts and circumstances (W. St. ¶49; R. St. ¶103). And as the following analysis shows, nothing supports a reasonable inference that the discretion was exercised in a sex-discriminatory manner.

In Wilkins' case Barzilai determined that Wilkins' effort to present explanatory circumstances did not excuse his otherwise violative conduct, so that the decision to terminate Wilkins had been correct (W. St. ¶53; R. St. ¶86; R. Resp. ¶54). On the other hand, in reviewing Dean's situation Russell concluded that Dean's conduct did not warrant the same consequence that had been visited on Wilkins. To that end Russell referred to the facts (1) that Wilkins had personally facilitated Dominique's discharge while Dean had not, (2) that Wilkins and not Dean was responsible for separating Dominique's Rounds Sheet from the rest of the sheets and (3) that Wilkins had erroneously marked Dominique as "in room," "in group" and "sleeping" over the course of six hours, while Dean had incorrectly initialed Dominique's Rounds

15

Sheet only twice over the course of 15 minutes and had not completed the accompanying location code (W. St. ¶67; R. St. ¶¶99, 105-07).

As is often repeated in the caselaw, it is not this Court's role to sit as a super-personnel department by second guessing decisions that are within Riveredge's discretionary business judgment. That is particularly true where, as here, Riveredge has articulated specific and rational reasons for the divergence between the decisions to rehire Dean and not to rehire Wilkins (Gordon, 246 F.3d at 888-89; Snipes v. Ill. Dep't of Corr., 291 F.3d 460, 463 (7th Cir. 2002)).

That characterization parallels the required consideration at the third (pretext) stage of the indirect method analysis (Gordon, 246 F.3d at 892). And that being so, Wilkins' prima facie case of sex discrimination fails, so that Riveredge is not obligated to proceed with its burden of explanation under the McDonnell Douglas scheme (Cerutti, 349 F.3d at 1064).

Although what has been said before now suffices to defeat Wilkins' claims, it is also true that nothing suggests Riveredge's stated reasons for its actions were a pretext for discrimination (R. St. ¶68). No evidence even hints that either Barzilai or Russell was being discriminatory (or for that matter that either of them was being unreasonable) in reaching their respective decisions (Flores, 182 F.3d at 516). There is no

question that Barzilai was unaware that Dean had initialed Dominique's Rounds Sheet when he made the decision as to Wilkins, and as already stated Russell articulated several sound bases for his decision (R. St. ¶¶89, 105-07).

## Conclusion

Wilkins' charge of a sex-discriminatory discharge is wholly empty, and the same thing is true of his claim that Riveredge discriminated against him when Russell decided to rehire Dean for her conduct several months after Barzilai had declined to rehire Wilkins for what Wilkins asserts is comparable conduct. Both of those contentions are totally unsupported by the factual record before this Court. There is no genuine issue of material fact, so that Riveredge's Rule 56 motion is granted and this action is dismissed.

_____
Milton I. Shadur
Senior United States District Judge

Date: April 26, 2004